UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

JOSEPH MARTINEZ,

        Plaintiff,

   -v-                           No.  04 Civ. 2728 (LTS)(DFE)

NEW YORK CITY DEPARTMENT OF
EDUCATION,

        Defendant.

-------------------------------------------------------x

## OPINION AND ORDER

           Pro se Plaintiff Joseph Martinez ("Plaintiff") brings this action against Defendant

New York City Department of Education ("NYC DOE" or "Defendant"), alleging that Defendant

engaged in discriminatory employment practices based on Plaintiff's sex and retaliated against him

in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq.,

and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296.  The Court has

jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction of

Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

           Defendant's motion for summary judgment dismissing Plaintiff's complaint in its

entirety is now before the Court.  Defendant's motion papers were accompanied by a Statement

pursuant to S.D.N.Y. Local Civil Rule 56.1, as well as a Notice to Pro Se Litigant Opposing

Motion for Summary Judgment as required by Local Civil Rule 56.2, and a number of evidentiary

submissions.  Plaintiff submitted a series of letters and evidentiary proffers in response, which the

Court has construed as his opposition to Defendant's motion.  (Docket Entries Nos. 45, 48.)  The

Court notes that, although Plaintiff has not submitted the required response to Defendant's Rule

56.1 Statement and Defendant's factual proffers could for that reason be taken as admitted under Local Civil Rule 56.1(c), the Court has examined carefully Plaintiff's letters and evidentiary proffers in determining whether there are genuine issues of material fact. The Court has also considered carefully Defendant's memoranda and accompanying affidavits and exhibits. For the following reasons, Defendant's motion is granted.

## BACKGROUND

Unless otherwise stated, the following material facts are undisputed to the extent that both parties submitted the same underlying evidence, or to the extent that they are premised on proffers by one party that are unrefuted by any proffer from the other.

Plaintiff is a male who was employed as a guidance counselor for most of the relevant period. (Declaration of Amy Grossberg, dated Jan. 29, 2007 ("Grossberg Decl.") Ex. H.) Dr. Ilisa Sulner ("Sulner"), the principal of P.S. 721X ("721X"), was Plaintiff's supervisor during his employment there.

### *April 2003 - McTaggart's claim of sexual harassment; OEO investigation*

On April 15, 2003, Kim McTaggart ("McTaggart"), another guidance counselor at 721X, sent a letter to Sulner accusing Plaintiff of sexual harassment. (Grossberg Decl. Ex. K.) Sulner thereafter ordered Plaintiff to "cease and desist" from his efforts to establish a personal relationship with McTaggart and informed him that representatives from the Board of Education's Office of Equal Opportunity ("OEO") would discuss the charges of sexual harassment with Plaintiff on May 7. (Id. Exs. L-N; Pl.'s Br. Ex. 2.)

At his May 7 interview with OEO, Plaintiff disputed most of McTaggart's factual

assertions. (Grossberg Decl. Ex. O; see also Pl.'s Br. Exs. 6, 8.) McTaggart repeated her allegations that she was being sexually harassed, and some witnesses, including another guidance counselor named Wanda Huertas ("Huertas"), corroborated McTaggart's factual claims. Sulner added that Plaintiff was contributing to "workplace disharmony," that he had not been keeping the incident quiet, and asked if Plaintiff could be transferred. (Grossberg Decl. Ex. O; Pl.'s Br. Ex. 5.)[1]

On May 22, the OEO issued a report finding that, while Plaintiff's actions did not constitute unlawful sexual harassment, they were "boorish, pestering, and insensitive," and that his conduct contributed to "workplace disharmony." (Grossberg Decl. Ex. O.) As a result, the OEO directed Plaintiff to attend sexual harassment training, to cease and desist conduct contributing to workplace disharmony, and to have no further personal contact with McTaggart. The OEO further recommended that Sulner issue a "cease and desist letter" to Plaintiff to be placed in his file and that the superintendent transfer Plaintiff as soon as reasonably possible "so as to minimize contact between the parties [Plaintiff and McTaggart]." (Id. Exs. O, R; Pl.'s Br. Ex. 1.) A few weeks later, Superintendent Susan Erber ("Erber") instructed Plaintiff to "cease and desist behavior which contributes to workplace disharmony" and directed Plaintiff to attend sexual harassment training. (Grossberg Decl. Ex. U.)

Plaintiff asserted, and continues to assert, that the entire sexual harassment charge and resulting sanctions were purposefully orchestrated by Sulner and others because Sulner did not like Plaintiff. (Grossberg Decl. Ex. JJ at 83:13-24.) In a letter to OEO dated June 2, 2003, Plaintiff wrote:

---

[1]     The record is not clear as to whether the OEO conducted a series of private interviews with the relevant parties, or whether the May 7 interviews were in the context of an informal hearing.

> The whole matter seems to have a tone of malicious intent. The situation seemed to be a set-up by the administrator and certain staff members of the school. It seems that certain teachers complaining of Ms. McTagg[a]rt's work and the meeting by Ms. Huertas precipitated sexual harassment charges. The union chapter chairman showed strong conflict of interest against me. I believe these factors show malicious intent and resulted in defamation of character.

(Id. Ex. S.)  Plaintiff repeated these allegations in sum and substance to co-workers, who in turn reported these conversations to Sulner.  (Id. Exs. T, Z.)  On June 19, Plaintiff wrote to the OEO that "[i]f anything I felt there was reverse harassment" with respect to McTaggart's allegations.[2]  (Id. Exs. V-W; Pl.'s Br. Ex.)  On July 3, Sulner noted to Plaintiff that she had become aware that Plaintiff was continuing to "engage in harassing behavior" associated with McTaggart, noted that Plaintiff's alleged remarks about McTaggart following the May 22 OEO report could be characterized as retaliation against McTaggart, ordered that Plaintiff "cease and desist" from any future conversations regarding McTaggart, and warned that failure to comply with her order might result in Plaintiff's removal from his position.  (Grossberg Decl. Ex. CC.)  Plaintiff told OEO about Sulner's July 3 letter and reiterated that he had "always felt that Ms. McTaggart filed sexual harassment [charges] because she felt pressure from Dr. Sulner.  Once again I feel that I am being harassed by Dr. Sulner."  (Id. Ex. DD; Pl.'s Br. Ex.)

On or about August 23, Plaintiff filed an employment discrimination charge with the EEOC.  (Grossberg Decl. Ex. JJ at 41.)  In addition, Plaintiff wrote to the EEOC[3] that, with regard to OEO decisions that find no unlawful sexual harassment but nonetheless impose sanctions, "[t]he

---

[2]      It is not clear whether he meant that McTaggart actually sexually harassed Plaintiff, as he appears to suggest elsewhere in the record, or that the allegedly false sexual harassment charge and resulting sanctions themselves constituted "reverse harassment."

[3]      It is not clear whether this letter was filed as part of Plaintiff's EEOC charge, or whether it was submitted separately.

overwhelming plaintiffs in a male-female scenario are males with no hope of appeal," appearing to suggest that it is predominately males who are sanctioned in some way by the NYC DOE as a result of alleged sexual harassment, even when no sexual harassment violation is found. (<u>Id.</u> Ex. MMM.) Chancellor's regulation A-830, which governs sexual harassment allegation investigations, is silent as to whether OEO had the authority to impose sanctions absent a finding that sexual harassment occurred.[4] (<u>Id.</u> Ex. N.) When asked at his deposition whether the alleged lack of an effective appeal system for OEO sanctions (where no finding of sexual harassment was made) was designed in such a way as to have an impact on one sex only, Plaintiff responded:

> They should change article A830 and put a clause in there for an appeal system for a person that is accused. And I don't care if it is a man, a woman, two bisexual woman or anything, one woman to a straight woman or a gay woman to a straight woman, they have to have an appeal system for the person that is accused . . . .

(<u>Id.</u> Ex. JJ at 127:18-24.)

### *May 2003 - transfer to 721M*

On May 20, 2003, Superintendent Erber's office sent Plaintiff a letter indicating that Plaintiff would be tentatively assigned to work at P 721M ("721M") for the summer of 2003. (Pl.'s Supp. Ex.; Grossberg Decl. Ex. Q.) On June 12, Erber sent Plaintiff a confirmation letter expressing Erber's understanding that Plaintiff had worked at 721M for the summer session in the previous year, and that Plaintiff was accepting an assignment to 721M again for the 2003 summer

---

[4]     It is undisputed, however, that the <u>superintendent</u> had the authority to order Plaintiff to attend sexual harassment training and issue the "cease and desist" letter for his file. (<u>Id.</u> Ex. QQ.)

session.  (Id. Ex. U.)  However, on July 1, Plaintiff filed a "Step II Grievance"[5] with the OEO and

asserted that he was not aware of the 2003 summer assignment to 721M until that day.  Plaintiff

later testified, and in the grievance claimed, that the transfer was not permissible because he had

seniority rights over Huertas, McTaggart, and Kennia Laucer ("Laucer") (another guidance

counselor), none of whom was transferred to 721M that summer.  (Pl.'s Br. Ex., Oct. 26, 2006 Pl.'s

Dep. at 166:18-19; Grossberg Decl. Ex. BB.)  The Step II Grievance did not allege discrimination

on the basis of sex.  Sulner responded that Plaintiff's assignment was based on the OEO's transfer

recommendation and Sulner's assertion that Plaintiff's harassment conduct was ongoing.  (Id. Ex.

EE.)  On or about July 8, the OEO concluded that Plaintiff failed to demonstrate that the 721M

transfer was "arbitrary or capricious."  (Id.)  No copy of the union contract or any other written

agreement addressing seniority is included in the record.

Plaintiff did not receive any cut in pay or benefits as a result of the transfer to 721M

and 721M was close to Plaintiff's home, but he suffered emotionally because several 721M

employees asked Plaintiff why he was transferred there.  (Grossberg Decl. Ex. EE; Pl.'s Br. Ex.,

Oct. 26, 2006 Pl.'s Dep. at 169:1-14.)  Plaintiff additionally testified that rumors with negative

connotations about his transfer spread amongst guidance counselors from different districts, though

he did not specify the basis of his knowledge of the rumors.  (Id. at 172:1-15.)

---

[5]     Based on the Step II Grievance complaint form, it appears to be a process whereby a
complainant requests a conference with the superintendent to discuss alleged
violations of union contract provisions.  (Grossberg Decl. Ex. BB.)  What follows
such a conference is not clear from the record but is, in any case, not material to this
action.

*September 2003 - transfer out of counselors' suite*

_____On or about September 2, 2003, Plaintiff returned to 721X and was asked to meet with Sulner in her office.  Sulner said, with the door open and speaking in a voice loud enough for others to hear, that Plaintiff's office was to be moved from the suite where guidance counselors and service providers worked because the suite had "a lot of female staff" and/or that "there were too many females there."  (Pl.'s Br. Ex., Oct. 26, 2006 Pl.'s Dep. at 178:11-12.)  She added that Plaintiff needed to be careful with what he said, and ordered him out of her office.  (Grossberg Decl. Ex. II.)  Plaintiff reported this incident to the OEO as another example of "harassment."  (Id.)

Plaintiff alleged that, as a result of his segregation from the counselors' suite, female employees gossiped about him and whether the transfer was related to the McTaggart charges.  In his deposition, Plaintiff testified about two female employees, Nellie Stabile ("Stabile") and Ms. Jervis ("Jervis"), who were afraid to speak with him because they feared that employees were spying on them or that, in Stabile's case, employees would ask her whether she was dating Plaintiff.  (Grossberg Decl. Ex. JJ at 83:2-6; 103:2-9; id. Ex. WW at 38:11-13; 103:20-25; Pl.'s Br. Ex., Oct. 30, 2006, Pl's Dep. at 41:22-42:10; 42:16-17; 43:9-10.)  Plaintiff also testified, with respect to the office transfer, that "[Sulner] wanted to just retaliate against me because I was bringing up a lot of charges.  She was making charges on me, I was making charges on her."  (Grossberg Decl. Ex. WW at 31:13-15.)

*September 2003 - alleged offensive behavior*

On September 11, 2003, the payroll secretary asked Plaintiff whether counselors were supposed to arrive at work 20 minutes or 10 minutes earlier than teachers.  Plaintiff answered

that he wasn't sure but that he thought it was 10 minutes.  At a meeting with the guidance

counselors, Sulner queried Plaintiff about this incident, Plaintiff described the conversation with

the payroll secretary, and Sulner angrily stated that she would not tolerate Plaintiff's talking back to

Sulner.  (Grossberg Decl. Ex. MM; Pl.'s Supp. Ex.)

On September 12, at a guidance counselor meeting, Plaintiff told an incoming

guidance counselor that if she had any problems with sexual harassment from men at the

workplace, that it would be taken care of.  (Pl.'s Supp. Ex.)  Several guidance counselors,

interpreting Plaintiff's remark as sarcasm in light of the McTaggart incident (see id.), thereafter

informed Sulner by letter that Plaintiff's remark "took us by surprise" and "caused a great level of

distress in the group," and that "we don't want to continue feeling uncomf[or]table, intimidated and

exposed to an offensive work environment."  (Grossberg Decl. Ex. KK.)  Sulner asked Plaintiff to

meet with her to discuss the incident (id. Ex. LL), and wrote in an e-mail to Superintendent Erber

that Plaintiff was "defiant and clearly ill."  (Pl.'s Supp. Ex.)  The meeting did not occur, for

disputed reasons not relevant to this motion practice.

Plaintiff immediately wrote a letter directly to the Chancellor of NYC DOE, alleging

that Sulner's angry outburst on September 11 and her arranging of the disciplinary meeting in

supposed response to the September 12 incident constituted retaliation for his August 23, 2003,

EEOC charge.  (Id. Ex. MM.)  The OEO responded[6] that it did not have jurisdiction to review

Plaintiff's accusation of retaliation.  (Pl.'s Br. Ex.; Grossberg Decl. Ex. NN.)

---

[6]  It appears that Plaintiff's letter was forwarded from the Chancellor's office to the
OEO.

On May 26, 2004, Sulner asked Margo Levy ("Levy"), the district's school-based services coordinator, via e-mail whether counselors were required to keep updated logs of their students at the school, available for review. Sulner wrote, "I have Martinez but good now—tell me please that you have a written directive that he is mandated to keep a log." (Pl.'s Br. Ex.) After Levy responded that logs were required to be kept, Sulner responded, "Yes -- he told me his log is too heavy to carry to school - this time I got him but good." (Id.) The record is not clear as to what, if anything, transpired after this exchange.

*September 2004 - Huertas' allegations of bullying; anger management workshop*

On September 10, 2004, in a letter to Sulner, Huertas accused Plaintiff of having physically intimidated and threatened her at a meeting conducted by McTaggert. Huertas expressed a desire to file a formal complaint against Plaintiff of "psychological bullying and harassment." (Grossberg Decl. Ex. RR.) Plaintiff disputes Huertas' characterization of his conduct at the meeting.

Kevin McCormack ("McCormack"), a Local Instructional Superintendent, arranged a meeting with Huertas and Plaintiff to discuss the incident. (Grossberg Decl. Ex. UU.) On November 19, McCormack concluded that Huertas' account of the meeting was more credible than Plaintiff's, and he directed Plaintiff to enroll in an anger management workshop on January 19, 2005. (Id. Ex. XX..) Plaintiff did not attend the anger management workshop. (Id. Ex. YY.) On March 11, 2005, McCormack found that Plaintiff's failure to attend the workshop constituted insubordination, directed him to attend an anger management workshop on March 16, and noted

that further incidents of that nature would result in disciplinary action.  (Id. Ex. BBB.)

     With respect to whether Plaintiff believed that McCormack, through his letters and his direction to take anger management class, was discriminating against Plaintiff because he was male, Plaintiff responded, "I imagine he was influenced by Dr. Sulner but I can't say that that is a sex bias no, not on his part. . . .  He would probably support or be swayed by Dr. Sulner's opinion than mine but . . . I don't think it would be a sex bias on his part."  (Grossberg Decl. Ex. WW at 30:17-20.)

*February 2005 - annual health fair*

     In or about February 2005, Plaintiff was asked by Mary Tierney ("Tierney"), another guidance counselor, to run the annual health fair, which consisted of various groups from the community or city agencies gathering to educate students about health issues.  (Pl.'s Br. Ex., Oct. 30, 2006 Dep. at 60:19-61:4.)  In order to prepare for the health fair, the coordinator had to send faxes out to the various agencies or groups, requesting them to return a fax indicating whether they were willing to participate.  (Id. at 62:4-7.)  Sulner had instituted a rule that no faxes were to be sent out unless they went through her secretary.  (Id. at 63:19-64:5.)  With about two weeks left before the fair, Tierney asked Plaintiff why they had not received any replies to their faxed invitations.  (Id. at 63:12-14.)  Plaintiff then asked Tierney who was preventing the faxes from going out, though the record is not clear as to what prompted him to ask this question.  According to Plaintiff's testimony, Tierney replied that it was Sulner.  The record does not shed any light on why Tierney asked Plaintiff about the lack of replies if she allegedly knew that Sulner prevented the invitations from going out.  (Id. at 63:18, 66:3-8, 67:12-13.)  Plaintiff did not ask Tierney why

Sulner did that.  (Id. at 68:14-17.)  Shortly afterwards, on or about April 5, 2005, believing that

Sulner was trying to sabotage his efforts and would try to fire him, Plaintiff retired.  (Id. at 68:21-

69:1; Grossberg Decl. Ex. FFF.)


_March 2005 - corporal punishment allegation_

＿＿＿＿＿＿＿On March 29, 2005, a parent alleged that Plaintiff had inflicted corporal punishment

on a student, and Sulner met with the parent on March 31.  (Grossberg Decl. Ex. EEE at 2.)  On

April 7, after Plaintiff had retired, Sulner scheduled a meeting with Plaintiff to take place on April

13 in order to discuss the corporal punishment charge.  (Id. Ex. GGG.)  Plaintiff did not attend the

meeting.  Sulner then sent him a letter rescheduling the meeting for April 19 (id. Ex. HHH), and

Plaintiff also failed to attend that meeting.  Sulner then rescheduled the meeting for May 11, and

informed Plaintiff that she would reach a conclusion without his input if he did not attend.  (Id. Ex.

III.)  Plaintiff did not attend the May 11 meeting.  (Id. Ex. JJ at 116:2-9.)  In or about mid-May,

Sulner recommended to the superintendent that Plaintiff be placed on an "Ineligible Inquiry" list,

(id. Ex. EEE at 3), and Superintendent Erber did so on May 24.  (Id. Exs. JJJ, KKK.)  As a result,

Plaintiff was unable to obtain certain teaching jobs after he retired from 721X.  (Pl.'s Supp. Ex.,

Pl's Dep. at 180:8-181:2.)  At his deposition, Plaintiff testified that Sulner set up a false corporal

punishment charge against him in retaliation for retiring (Grossberg Decl. Ex. JJ at 48:15-25),

which had allegedly deprived Sulner of the pleasure of firing him.  (Id. at 125:5-16.)


_Pension miscalculation_

＿＿＿＿＿＿＿Plaintiff testified that two years of his employment were improperly omitted in

calculating his pension. (Pl.'s Br. Ex., Nov. 3, 2006 Pl.'s Dep. at 109:2-15.) When Plaintiff contacted an unspecified NYC DOE agent about the alleged calculation error, he was told something to the effect that the records for the omitted years had been placed in a basement and that the discrepancy "should be corrected." (Id. at 109:10-15, 110:13-17, 111:14-18, 112:2-8.) Plaintiff nonetheless feels that the pension issue is part of a "whole ball of wax [that] was a retaliation against me after a point." (Id. at 109:4-6.) Plaintiff does not, however, believe that the pension miscalculation was the product of sex discrimination. (Id. at 110:8-12; 111:1-3.)


_Additional testimony from Plaintiff_

The record contains additional proffers as to Sulner's management style generally and her attitude towards Plaintiff. Plaintiff testified that "as far as Dr. Sulner goes, . . . when she sees anybody . . . disagreeing with her, she right away gets very defensive and she starts to retaliate." (Grossberg Decl. Ex. JJ at 44:13-16.) In an unsworn statement by Plaintiff submitted to the Court, he noted that Jean Marie Chin ("Chin"), an assistant principal under Sulner, "has to be careful of Dr. Sulner," who allegedly had another assistant principal removed from the school after 30 years of service. (Id. Ex. VV.) Testifying that "a lot of people feared [Sulner]," Plaintiff said that a teacher named Ms. Giblin, "shaking like a leaf," once came up to Plaintiff and told him that Sulner would fire her even though Giblin was on tenure and had worked at 721X for 30 years. (Pl.'s Supp. Ex. Pl's Dep. at 109:15-110:2.) Plaintiff asserted that Sulner exhibited clear favoritism by, for instance, putting favored guidance counselors in charge of running meetings. (See Oct. 30, 2006 Pl.'s Dep. at 52:1-5 (those in "Sulner's wing" placed in charge of meetings); id. at 53:1-3 ("she treated some people unfairly better than others like Ms. Huertas. Everybody knew who the

ones that she liked.  She made it known.  Everybody knew.").)  When asked whether the sexual

harassment charges, the anger management workshop requirement, the corporal punishment charge,

and the annual health fair incident led Plaintiff to believe Sulner disfavored him because he was a

man, Plaintiff responded, "It may not have been -- the retaliation, it has nothing to do with whether

I am a man or not." (Id. Ex. JJ at 126:9-20.)  Plaintiff further testified that on four or five occasions

over several years, Chin made statements to Plaintiff to the effect that "Sulner thinks shit of you,"

and that Sulner asked Chin to convey that sentiment to Plaintiff each time.  (Pl.'s Br. Ex., Oct. 26,

2006 Pl.'s Dep. 72:20-73:16.; 73:21-24.)

On the basis of the foregoing facts, Plaintiff asserts claims of disparate treatment on

the basis of his sex, hostile work environment and retaliation for his protected activity.


DISCUSSION

Summary judgment shall be granted in favor of a moving party where the

"pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  In the summary judgment context, a fact is material "if it 'might affect the

outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence

is such that a reasonable jury could return a verdict for the nonmoving party.'"  Holtz v.

Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986)).  The non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with

specific facts showing that there is a genuine issue for trial."  Caldarola v. Calabrese, 298 F.3d 156,

160 (2d Cir. 2002) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (alteration in original)).  "[M]ere conclusory allegations, speculation or conjecture" will not provide a sufficient basis for a non-moving party to resist summary judgment.  <u>Cifarelli v. Vill. of Babylon</u>, 93 F.3d 47, 51 (2d Cir. 1996).

## *Hostile Work Environment*

_____In his Second Amended Complaint, Plaintiff alleges that "Dr. Sulner felt authorized to discriminate, segregate, and create a hostile environment for me."  (Second Am. Compl. ¶ 8.) The Court construes this statement as asserting a claim of hostile work environment, and construes all of Plaintiff's evidentiary proffers submitted in connection with Defendant's motion for summary judgment as the factual bases for Plaintiff's claim.

In order to establish a claim of hostile work environment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993).  The environment must be both subjectively and objectively hostile and abusive.  <u>Hayut v. State Univ. of N.Y.</u>, 352 F.3d 733, 745 (2d Cir. 2003).  Isolated instances of harassment ordinarily do not rise to the level necessary for an employee to survive summary judgment on a claim of hostile work environment harassment; rather, the employee must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted, to have altered the conditions of his working environment.  <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d. Cir. 2000).  Relevant factors include "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The Supreme Court has set a demanding test in order to avoid construing Title VII as a "general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998). Moreover, "it is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of [his] sex." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). Lastly, the Court analyzes hostile work environment claims by evaluating the totality of the circumstances. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767 (2d Cir. 1998).

Plaintiff's claim of hostile work environment fails, primarily because no rational fact-finder could conclude that any of the alleged mistreatment Plaintiff endured was inflicted on him because of his sex. See Alfano, 294 F.3d at 377 ("even though [the incidents] can support an inference that Alfano was mistreated, they do not support an inference that this was because of her sex"). Although facially-neutral incidents may be considered in a hostile work environment analysis, evidence must be proffered from which a "a reasonable fact-finder could conclude that [the incidents] were, in fact, based on sex. . . . [T]his requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." Alfano, 294 F.3d at 378. Plaintiff proffers no evidence of sex-based animus, either from Sulner or any other administrator or supervisor, in connection with any of the incidents described in the record. Nor is there any circumstantial evidence of sex-based mistreatment, such as examples of similarly situated males treated similarly, or similarly situated females treated differently. While the record certainly contains evidence suggesting that Sulner disliked Plaintiff personally, there is nothing in the record

from which it can be inferred that such dislike was due to his sex and, if anything, Plaintiff's own testimony regarding two female employees who allegedly lived in constant fear of Sulner because they perceived that Sulner did not like them undermines Plaintiff's claim that Sulner was biased against men.

Although Plaintiff asserted in a letter to the OEO that the operation of the discipline system in connection with harassment claims disproportionately affected males, he has proffered no evidence that males charged with sexual harassment were treated differently than females charged with sexual harassment. Moreover, when specifically asked whether Plaintiff believed that the OEO withheld opportunities for appeal based on the accused's sex, Plaintiff avoided the question, and his response explicitly revealed his belief that the system was not unfair on the basis of sex. (Grossberg Decl. Ex. JJ at 127:18-24 ("I don't care if it is a man, a woman, . . . they have to have an appeal system for the person that is accused.").) When specifically asked whether Sulner disfavored him because he was a man with respect to the anger management course, sexual harassment training, and annual health fair incidents, Plaintiff responded, "It may not have been" and added that "it has nothing to do with whether I am a man or not." In light of the lack of any direct or circumstantial evidence that any of the treatment Plaintiff faced was because of sex, Plaintiff's own proffer that other female employees were similarly harassed by Sulner, and Plaintiff's disavowals during his deposition of any contention that certain incidents were the product of sex-based bias, the Court concludes that no rational fact-finder could determine that any of the treatment alleged by Plaintiff to have created a hostile work environment was motivated by sex-related bias.

Plaintiff repeatedly emphasizes the incident in which Sulner, in a voice allegedly

loud enough for the guidance counselors to hear, ordered Plaintiff to move out of the counselors' suite because there were "too many females there" (or made a comment to the same effect). Interpreted in the light most favorable to Plaintiff, the comment could be construed as rude and as suggesting that Plaintiff was so dangerous or inappropriate that he could not be trusted around females, but Plaintiff proffers no basis from which it can be inferred that Sulner could not or would not have made the same comment to a female employee who had been accused of sexual harassment towards females.[7] "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998) (male employee alleging humiliating harassment of a vulgar and sexual nature from other males did not have viable hostile work environment claim where there was no proffer that female employees would not have suffered similar type of harassment) (quotations omitted). There is nothing inherent in Sulner's comment itself to suggest that Sulner was motivated by hostility towards men, or that the comment could only be directed to one sex. <u>See, e.g.</u>, <u>id.</u> ("A trier of fact might reasonably find such discrimination . . . if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace."). Therefore, Plaintiff's transfer out of the counselors' suite cannot serve as a basis for any sex

---

[7]     The comment might also be read to suggest that Sulner was creating a sex-segregated work environment, but Plaintiff has never made this specific charge, nothing on the face of the comment suggests that Sulner was motivated to exclude males generally, and the record contains no information as to the numbers and types of people assigned to different areas of the office.

discrimination-based hostile work environment claim.[8]

"It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." Id., 294 F.3d at 377. After a careful and thorough review of all the evidentiary submissions in the record, and after weighing the nature, severity, and frequency of the complained-of conduct, with "particular sensitivity to the fact that evidence of [prohibited] discrimination is rarely overt," Curtis v. Airborne Freight Corp., 87 F. Supp. 2d 234, 250 (S.D.N.Y. 2000), the Court concludes that Plaintiff's proffers are insufficient as a matter of law to raise a triable question as to the underlying motivation, or as to the severity or pervasiveness of misconduct required to establish, a sex-based hostile work environment claim. Therefore, Defendant's motion for summary judgment is granted

---

[8] Plaintiff, furthermore, proffers nothing to suggest that the ramifications of his transfer out of the counselors' suite, even if it were based on sex, were so great so as to alter the terms and conditions of his employment, or to impede Plaintiff's ability to function in the workplace. Compare Alfano, 294 F.3d at 381 ("Alfano has not pointed to any conduct that endangered her or her authority in a way that would drive her from a perilous employment. She was simply embarrassed on a handful of occasions over a period of four years by the boorish behavior of one or more unidentified co-workers"); with Howley v. Town of Stratford, 217 F.3d 141, 154-55 (2d Cir. 2000) (viable hostile work environment claim where female firefighter subjected to sexually explicit and degrading barrage of insult delivered by subordinate firefighter in front of her other subordinates, where same subordinates later resisted orders from the plaintiff and spread rumors amongst themselves questioning her competence, directly impacting her ability to do her job). The only non-speculative harm alleged by Plaintiff as a result of the transfer was the fact that Stabile and Jervis were deterred from speaking with Plaintiff. However, nothing in the record indicates that Plaintiff's ability to perform his job was at all dependent on his interactions with Stabile or Jervis, there is nothing to suggest that the barriers placed between him and other female employees were of such a tangible and severe nature so as to alter the terms and conditions of his employment, and Plaintiff proffers no non-speculative evidence that he or any female employee who spoke with him after he was transferred was actually punished or harmed on account of such communication in any material way.

as to Plaintiff's hostile work environment claim.

*Disparate Treatment*

Plaintiff asserts in his Second Amended Complaint that the McTaggart sexual harassment charge and resulting sanctions, the summer transfer to 721M, and the transfer out of the counselors' suite were the products of discrimination on the basis of sex. Because the pro se Plaintiff's evidentiary proffers submitted in connection with Defendant's motion for summary judgment not only describe these underlying events but also reference events not alluded to in the complaint, the Court has also considered whether any of the additional information is sufficient to raise a genuine issue of material fact as to whether Plaintiff was subjected to sex-based disparate treatment.[9]

In the summary judgment context, disparate treatment claims brought under Title VII are analyzed under the familiar three-step burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[10] A plaintiff must first establish a prima facie

---

[9] The Court does not construe Plaintiff's complaint about an allegedly improper reduction of his pension benefit as a sex-based disparate treatment claim, because Plaintiff explicitly disclaimed any assertion that the pension benefit cut was imposed because of his sex. Plaintiff gave equivocal responses to questions specifically asking him whether he believed certain other acts were a result of sex discrimination, but given Plaintiff's pro se status, the Court does not construe Plaintiff's deposition statements as disclaiming a particular disparate treatment claim unless the statement was explicit and clear. (See, e.g., Pl.'s Br. Ex., Nov. 3, 2006 Pl.'s Dep. at 111:1-3 ("Q: You think that someone was discriminating because you are a man when they took two years from your pension? A: No . . . .").)

[10] Plaintiff's discrimination claims under the NYSHRL are subject to the same standard of proof as claims under Title VII. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000); Selmanovic v. NYSE Group, Inc., No. 06 Civ. 3046 (DAB), 2007 WL 4563431, at 4 (S.D.N.Y. Dec. 21, 2007).

case of discrimination, which comprises four factors: 1) he belonged to a protected class, 2) he was qualified for the position, 3) he suffered an adverse employment action, and 4) there were circumstances giving rise to an inference of prohibited discrimination.  Id., 411 U.S. at 802; Song v. Ives Labs., Inc., 957 F.2d 1041, 1045 (2d Cir. 1992); Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985).  Once a plaintiff has made out a prima facie case, the burden shifts to the employer to offer some legitimate, nondiscriminatory reason for its actions.  McDonnell, 411 U.S. at 802.  "This burden is one of production, not persuasion," Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000), and it can involve no credibility assessment of the evidence.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).  At this stage, the employer does not need to prove by a preponderance of the evidence that the rationale was not discriminatory, but must present a clear explanation for the action.  Gibbs v. Consol. Edison Co. of N.Y., Inc., 714 F. Supp. 85, 89 (S.D.N.Y. 1989).  If the employer meets its burden, the plaintiff is required to put forth evidence demonstrating a genuine issue of material fact as to whether the stated reasons are pretext for prohibited discrimination.  Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000).

It is undisputed that Plaintiff belonged to a protected class (male) and that he possessed the basic skills necessary for performance of his job as a guidance counselor.  However, as the Court has already explained in the hostile work environment section, Plaintiff has failed to proffer any evidence of circumstances giving rise to an inference of discrimination based on sex.  As a result, he has failed to meet his burden of coming forward with sufficient facts to make his prima facie case as to any disparate treatment claim and Defendant is entitled to judgment as a

matter of law on Plaintiff's disparate treatment claims.[11]

_Retaliation_

        In Plaintiff's Second Amended Complaint, he alleges that the corporal punishment charge and the resulting Ineligible Inquiry list placement constituted retaliation, presumably for the various letters that had been filed by Plaintiff with the OEO, the Step II Grievance, and Plaintiff's EEOC charge, evidence of which was appended to the complaint. Plaintiff later testified that

---

[11]      Plaintiff also proffers no evidence that he suffered any adverse employment action, with the exception of his placement on the Ineligible Inquiry list. See Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005) (an adverse employment action is a "materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities"). Sulner's (as well as the OEO's and Erber's) repeated written warnings to and meetings with Plaintiff do not constitute adverse employment actions, see Hill v. The Children's Village, 196 F. Supp. 2d 389, 397 (S.D.N.Y. 2002) (warning letters insufficient), and the perceived stigma and impaired social interactions, the only proffered harms arising from Plaintiff's temporary transfer to 721M and his transfer out of the counselors' suite, are too intangible to constitute a "materially significant disadvantage." Galabya v. NYC Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000); see Boyd v. Presbyterian Hospital in the City of New York, 160 F. Supp. 2d 522, 536-37 (S.D.N.Y. 2001) ("gossips, the false accusations, . . . and the hyperintensified observation" insufficient to constitute adverse employment action). Plaintiff proffers no evidence from which a rational fact-finder could conclude that the sexual harassment and anger management courses or the health fair fax incident were anything more than mere inconveniences for Plaintiff with no tangible effect on the terms and conditions of his employment. Lastly, no rational fact-finder could conclude that the working conditions were so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign when he did, such that his retirement would be considered a constructive discharge. See Ferraro v. Kellwood Co., 440 F.3d 96, 101 (2d Cir. 2006) (constructive discharge standard); Martin v. Citibank, N.A., 762 F.2d 212, 221 (2d Cir. 1985) (evidence that supervisor loudly mentioned plaintiff was polygraphed and therefore suspected of wrongdoing, complained about plaintiff's attitude to co-workers, once gave plaintiff wrong combination to night deposit box, and twice required plaintiff to process deposits while serving customers contrary to bank policy, insufficient as a matter of law to establish constructive discharge).

Sulner took these actions in retaliation for his retirement, which allegedly deprived her of the pleasure of firing him. Plaintiff also appears to assert, based on the various comments given at his depositions, that much of the alleged mistreatment he faced was in retaliation for any and all the grievances he filed over the years. Therefore, the Court shall, as it did with Plaintiff's other claims, broadly construe Plaintiff's retaliation claims as asserting that all of Defendant's actions described in the record were taken in response to any or all of the grievances filed by Plaintiff during the relevant period, and/or in response to his retirement.

In this summary judgment context, retaliation claims brought under Title VII are also analyzed under a three-step burden shifting analysis. See Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996) (applying burden-shifting analysis to retaliation claims). In order to establish the basic prima facie case of retaliation under Title VII, Plaintiff must proffer evidence sufficient to demonstrate that: 1) he engaged in a protected activity, 2) Defendant knew of the protected activity, 3) Defendant took adverse action against Plaintiff which might well have dissuaded a reasonable worker from engaging in protected activity; and 4) a causal connection between the protected activity and the adverse action. Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006).

Protected activity includes participation in any investigation, proceeding or hearing under Title VII as well as any opposition to any practice made unlawful by Title VII, and may include formal as well as informal complaints. See 42 U.S.C. § 2000e-3(a); Rodriguez v. Beechmont Bus Serv., Inc., 173 F. Supp. 2d 139, 149 (S.D.N.Y. 2001). Plaintiff alleges repeatedly that Sulner's corporal punishment charge was in retaliation for his retirement, but his retirement was in no way a communication of a complaint about activity made unlawful by Title VII, so his

retirement cannot serve as a basis for alleging retaliatory conduct.  Most of Plaintiff's letters to the

OEO (<u>e.g.</u>, the June 2, 2003, letter alleging "malicious intent") do not constitute protected activity

because nothing in those submissions could be read to complain of discrimination on the basis of

sex; rather, they complain of allegedly unfair treatment from Sulner on the basis of personal

animosity.  The Step II Grievance was not protected activity as a matter of law, because it alleged

that his transfer to 721M was unwarranted solely based on his alleged seniority rights under a

contract and did not allege sex discrimination.

Plaintiff has, however, proffered evidence of other activities which might be

considered protected.  Plaintiff's June 2003 letters to the OEO about "reverse harassment,"[12] his

EEOC charge filed in August 23, 2003, the August 23, 2003 letter to the OEO about the allegedly

disproportionate impact of OEO decisions against males, his September 2003 letter to the OEO

alleging Sulner's retaliation for the EEOC charge, and this lawsuit, which was commenced in April

2004, will all be construed for purposes of this analysis as raising complaints of discrimination

based on sex or complaints of retaliation for protected activity, and therefore constituting protected

activity for purposes of Plaintiff's <u>prima facie</u> case.[13]

---

[12]    Given the nature of McTaggart's original sexual harassment charge against Plaintiff,
the Court construes Plaintiff's complaint of "reverse harassment" to also be an
implicit allegation that, rather than being the perpetrator of sex discrimination through
his own sexual harassment, Plaintiff was the victim of sex discrimination through
McTaggart's and/or Sulner's "reverse" harassment.

[13]    Defendant argues that none of the activities for which Plaintiff alleges retaliation
should qualify as protected, because Plaintiff had no good faith, reasonable belief
that any of the underlying challenged actions violated Title VII.  <u>See</u> <u>Manoharan v.
Columbia Univ. College of Physicians & Surgeons</u>, 842 F.2d 590, 593 (2d Cir.
1988) (in meeting the plaintiff's <u>prima facie</u> burden for a retaliation claim, while
"the plaintiff need not establish that the conduct he opposed was in fact a violation
of Title VII, . . . the plaintiff must demonstrate a good faith, reasonable belief that
the underlying challenged actions of the employer violated the law.").  The Court

Plaintiff has also established that Defendant had knowledge of the aforementioned protected activities. Although Defendant correctly notes that Plaintiff has proffered no evidence that Sulner personally knew about Plaintiff's protected activity (see Grossberg Decl. Ex. JJ at 45-47), there is no dispute that the New York City Department of Education, as a corporate entity and Defendant in this case, knew about Plaintiff's protected activity. See Gordon v. NYC Bd. of Educ., 232 F.3d 111, 116 (2d Cir.2000) ("[nothing] more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity"). Therefore, Plaintiff has met the second element of his prima facie case with respect to his retaliation claim.

Under the third prong, Plaintiff must show that the retaliatory acts complained of might well have deterred a reasonable employee from engaging in protected activity. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006). Petty slights, minor annoyances, personality conflicts that generate antipathy, snubbing, the sporadic use of abusive language, or a simple lack of good manners, often experienced at work, do not rise to the level of actionable conduct in a Title VII retaliation claim. Id. at 2415. In this case, incidents where Sulner publicly yelled at Plaintiff for various reasons or called him "shit" through Chin constitute, as a matter of law, the sorts of petty slights and personality conflicts that are not actionable. Nor could a rational fact-finder conclude that a reasonable employee would be deterred from complaining of discrimination by an isolated incident in which a second-hand source informed him that his supervisor had blocked his faxes from being sent out, particularly when the employee did not even attempt to follow up on that assertion with the supervisor directly. The

need not address this specific argument, however, because the Court concludes ultimately that Plaintiff has failed to proffer any evidence rebutting Defendant's own proffers of legitimate, nondiscriminatory reasons for its actions.

order to attend sexual harassment training and the order to transfer Plaintiff to 721M for the summer cannot support viable retaliation claims because those events occurred before any of Plaintiff's protected activities. A rational fact-finder could, however, conclude that the September 2003 transfer out of the counselors' suite,[14] the November 2004 order to attend the anger management workshop, the May 2005 placement on the Ineligible Inquiry list and the calculated cut in pension benefits could well dissuade a reasonable employee from engaging in protected activity.

 With respect to the fourth prong of his <u>prima facie</u> retaliation claim, "[a] plaintiff can demonstrate a causal connection (a) indirectly by showing that the protected activity was followed closely by discriminatory treatment; (b) indirectly through other evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (c) directly through evidence of retaliatory animus." <u>See</u> <u>Carr v. West LB Admin., Inc.</u>, 171 F. Supp. 2d 302, 309 (S.D.N.Y. 2001) (<u>citing</u> <u>DeCintio v. Westchester County Med. Ctr.</u>, 821 F.2d 111, 115 (2d Cir. 1987)). There is no evidence of disparate treatment of other employees who engaged in similar conduct and no direct evidence of retaliatory animus. Nonetheless, the counselors' suite transfer and the anger management workshop order are sufficiently proximate in time to Plaintiff's

---

[14] Defendant cites <u>Gamble v. Chertoff</u>, No. 04 Civ 9410 (WHP), 2006 WL 3794290, *8 (S.D.N.Y. Dec. 27, 2006) for the proposition that a mere transfer into another cubicle is trivial and would not rise to the level of an actionable retaliation claim, but a genuine issue does exist as to whether a transfer, not from one cubicle in the counselors' suite to another cubicle in the counselors' suite, but out of the counselors' suite entirely, separating the employee from the rest of his colleagues, would have a stigmatizing effect sufficient to deter a reasonable person from engaging in protected activity for purposes of Plaintiff's retaliation claims, even if the stigmatizing effect does not constitute an adverse employment action for purposes of Plaintiff's disparate treatment claims. <u>See</u> <u>Burlington</u>, 126 S. Ct. at 2412-13 (anti-retaliatory provision of Title VII not limited to the adverse employment actions required for disparate treatment claims).

protected activities to demonstrate a causal connection for <u>prima facie</u> case purposes, and the same applies for the Ineligible Inquiry list placement and pension cut,[15] albeit barely so.[16]

Defendant has met its burden of proffering legitimate, nondiscriminatory reasons for its actions. With respect to the transfer out of the counselors' suite, Defendant proffers that Sulner sought to prevent any further harassing behavior on the part of Plaintiff. Defendant proffers that the anger management workshop was ordered because McCormack found Huertas more credible in her complaints that Plaintiff had inappropriately intimidated her at a meeting in September 2004. Plaintiff was placed on the Ineligible Inquiry list allegedly because he turned down three opportunities to contest the charges of corporal punishment. Plaintiff testified to the NYC DOE's explanation that the pension discrepancy was the result of misplaced records and admission that the calculation "should be corrected." Therefore, the burden shifts back to Plaintiff to proffer some evidence sufficient to raise a genuine issue of fact as to whether these reasons were merely a pretext for retaliation.

Other than the temporal proximity between Plaintiff's protected activities and the alleged retaliatory actions, Plaintiff has failed to proffer any evidence, direct or circumstantial, that any of Defendant's explanations for its activities were merely pretext for retaliating against Plaintiff

---

[15]    Although Plaintiff proffers no evidence as to when his pension payment was calculated, the Court resolves this ambiguity in favor of Plaintiff by reasonably assuming that the pension benefit was calculated on or around the time that Plaintiff retired.

[16]    See <u>Spencer v. The Perrier Group of America</u>, No. 95 Civ 8404 (JSR), May 28, 1997 (S.D.N.Y. May 28, 1997) (without applying burden-shifting analysis, noting in dicta, "While an individual who complains of discrimination to the [EEOC] enjoys protection against retaliation, the mere filing of such a complaint does not . . . create an automatic presumption that any subsequent employer action adverse to the employee is retaliatory in nature").

for his protected activities. There is no evidence, for example, of any statement by any supervisor with respect to Plaintiff's protected activities, and there is no evidence of retaliation against other employees engaged in protected activities. With respect to the counselors' suite transfer, Plaintiff proffers no evidence from which a rational fact-finder could infer, given OEO's recommendation that Plaintiff be transferred away from 721X entirely, OEO's order that Plaintiff cease all contact with McTaggart, OEO's finding that he was contributing to "workplace disharmony," and Plaintiff's willingness to continue talking about the McTaggart incident with co-workers, that Defendant's proffered explanation was merely pretext for a retaliatory motive. In sum, there is nothing, beyond Plaintiff's bare conclusory allegations and mere temporal proximity, from which a rational fact-finder could conclude that the transfer constituted retaliation for protected activity. See Bell v. Rochester Gas & Elec. Corp., --- F. Supp. 2d ---, 2008 WL 803652, *10 (W.D.N.Y. Mar. 26, 2008) (although the "temporal proximity of these events [protected activity and termination] may be found to create an inference of retaliation for the purposes of [plaintiff's] prima facie case, without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext") (quoting Simpson v. N.Y. State Dep't of Civil Servs., No. 05-1492-CV, 2006 WL 93011, *2 (2d Cir. Jan. 9, 2006)).

Plaintiff similarly proffers no additional evidence calling into question Defendant's proffered reasons for ordering Plaintiff to attend the anger management workshop, placing Plaintiff on the Ineligible Inquiry list, or miscalculating Plaintiff's pension, and there is no evidence, beyond mere temporal proximity, that would even suggest a retaliatory motivation for these actions. Therefore, no genuine issue as to pretext exists, Defendant is entitled to judgment as a matter of law dismissing Plaintiff's retaliation claims, and Defendant's motion for summary judgment is

granted as to Plaintiff's claims for retaliation.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in

its entirety. The Clerk of Court is respectfully requested to terminate all pending motions, enter

judgment in favor of Defendant, and close this case.

Dated: New York, New York
      May 27, 2008

LAURA TAYLOR SWAIN
United States District Judge